UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SFC Global Supply Chain, Inc.,                    File No. 21-cv-914 (ECT/TNL)

       Plaintiff,

v.                                                **OPINION AND ORDER**

DNO, Inc.,

       Defendant.

---

Shannon M. McDonough and Brandon A. Carmack, Fafinksi Mark & Johnson, P.A., Eden Prairie, MN, for Plaintiff SFC Global Supply Chain, Inc.

Chelsea L. Gauger, Michael S. Rowley, and Gregory J. Young, Goetz & Eckland P.A., Minneapolis, MN, for Defendant DNO, Inc.

---

This commercial case concerns a shipment of plastic-tainted cabbage. Plaintiff SFC Global Supply Chain, Inc. is a Minnesota-based wholly owned subsidiary of Schwan's Company. Compl. ¶¶ 3, 8 [ECF No. 1-1]. Among other business activities, SFC "oversees and operates . . . two Asian-style food plants in Houston, Texas." *Id.* ¶ 15. In October 2020, SFC purchased cabbage from Defendant DNO, Inc. for delivery to one of SFC's Houston plants. *Id.* ¶¶ 38–40. At least when SFC commenced this action, DNO was incorporated under Ohio law and maintained its principal place of business there in Columbus. First DiNovo Decl. ¶ 3 [ECF No. 6]. The cabbage came from Michigan and was shipped from there to Texas without entering Minnesota. *Id.* ¶¶ 19, 22. After delivery and some processing, SFC discovered the cabbage was contaminated with plastic tags.

Compl. ¶ 43; *see* First DiNovo Decl. ¶ 25, Ex. 11 at 46[1] [ECF No. 6-1] (including a photograph of a retail-price-like tag). SFC alleges that the tainted cabbage compromised its manufacturing equipment, in turn requiring a shut-down of production lines, extensive inspection, cleaning, and repair of the equipment, and the discard of product. Compl. ¶¶ 43–44.

DNO has filed a motion to dismiss for lack of personal jurisdiction. ECF No. 3.[2] The motion will be granted. As a matter of law, DNO's lawsuit-related activities did not create a sufficiently substantial connection to Minnesota, and maintenance of the suit here would offend traditional notions of fair play and substantial justice. The relevant aspects of the at-issue cabbage transaction occurred almost entirely outside Minnesota. It is true that DNO sold the cabbage under a contract with a Minnesota corporation and that the contract included a Minnesota choice-of-law clause. But Eighth Circuit cases instruct that those facts are not dispositive. What matters is that the contract did not establish a course

---

[1]     Pages are cited by reference to the ECF page numbers (in the top right corner).

[2]     There is subject-matter jurisdiction over this case under 28 U.S.C. § 1332. SFC brought the case originally in Minnesota state court in the Fourth Judicial District, Hennepin County, and DNO timely removed the case. *See* Notice of Removal [ECF No. 1]. SFC and DNO are of diverse citizenship. SFC is incorporated under Minnesota law and maintains its principal place of business here. Compl. ¶ 8. As noted, at least when SFC commenced this case, DNO was incorporated under Ohio law and maintained its principal place of business there. First DiNovo Decl. ¶ 3. Though neither SFC's complaint nor DNO's removal pleadings identify an amount in controversy, SFC's complaint alleges "significant losses" resulting from the tainted cabbage with enough particularity to plausibly infer that the amount in controversy far exceeds the sum or value of $75,000. Compl. ¶ 6. Also, when asked about this issue at the hearing, counsel for both SFC and DNO represented that the amount in controversy is far greater than $75,000.

of dealing or future obligations that would have prompted DNO to reasonably anticipate being sued in Minnesota.

"Personal jurisdiction . . . is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (second alteration in original) (citation and internal quotation marks omitted). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Id.* (citations omitted). "But where, as here, the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citation omitted). At the summary-judgment stage, a case should not be dismissed for lack of personal jurisdiction "if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id.* (citations omitted).

For the exercise of personal jurisdiction to be proper in a diversity case, it must comport with both the forum state's long-arm statute and due process. *Id.* Because Minnesota's long-arm statute, Minn. Stat. § 543.19, is "coextensive with constitutional limits," this two-part issue boils down to one: whether the exercise of personal jurisdiction

comports with due process. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006). Due

process requires that each defendant has sufficient "minimum contacts" with the forum

state so that "maintenance of the suit does not offend traditional notions of fair play and

substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (citations and

internal quotation marks omitted). This means "actions by the defendant[s]" themselves

must "create a substantial connection with the forum [s]tate" and provide "fair warning" to

defendants that they may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 472, 475 (1985) (citations and internal quotation marks omitted); *accord,*

*e.g.*, *Creative Calling*, 799 F.3d at 980 (explaining defendant's contacts must permit it to

"reasonably anticipate being haled into court" in the foreign state (citation and internal

quotation marks omitted)). The "fair warning" requirement will be met if defendants have

"'purposefully directed' [their] activities at residents of the forum, and the litigation results

from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.*,

471 U.S. at 472–73 (citations omitted).[3]

---

[3]      Specific jurisdiction exists over a cause of action arising out of or related to a
defendant's contacts with the forum state, whereas general jurisdiction is broader and
reaches any cause of action against a defendant whose forum contacts "are so 'continuous
and systematic' as to render [it] essentially at home in the forum [s]tate." *Quality Bicycle
Prods., Inc. v. BikeBaron, LLC*, No. 12-cv-2397 (RHK/TNL), 2013 WL 3465279, at *3
(D. Minn. July 10, 2013) (alterations in original) (quoting *Goodyear Dunlop Tires
Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Here, DNO is indisputably not "at
home" in Minnesota, making this a question of specific personal jurisdiction. First DiNovo
Decl. ¶ 3. In its opposition brief, SFC says that it "reserves all rights if discovery shows
DNO's dealings and contacts with Minnesota could also establish general jurisdiction."
Pl.'s Mem. in Opp'n at 14 n.3 [ECF No. 10]. No factual or legal authority is cited to
support the aim or propriety of such a reservation. SFC is not understood to argue that
adjudication of DNO's motion should be delayed so that it may pursue discovery
concerning personal jurisdiction. Regardless, SFC alleges no facts in its complaint and

Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether a defendant has sufficient minimum contacts with the forum state to justify a finding of personal jurisdiction: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). The first three factors are of primary importance, whereas the remaining two are secondary. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (citation omitted).[4] A court must consider these factors in the aggregate rather than individually. *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995) (citation omitted).

(1) As a matter of law, the nature and quality of DNO's Minnesota contacts weigh against finding personal jurisdiction. In other words, no factfinder could reasonably conclude that the nature and quality of DNO's Minnesota contacts support finding personal jurisdiction. DNO's Minnesota contacts lack an important attribute: the presence of

---

identifies no evidence in its submissions hinting that DNO might have been "at home" in Minnesota when this case was commenced.

[4] "[T]he better understanding of the Eighth Circuit's statements that the last two factors are 'not determinative' or 'not dispositive' is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with the forum." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, __ F. Supp. 3d ___, No. 20-cv-1731 (ECT/KMM), 2021 WL 465323, at *5 n.3 (D. Minn. Feb. 9, 2021) (tracing history of Eighth Circuit's personal jurisdiction factors).

contractual terms or a course of dealing from which a factfinder could conclude that DNO created a continuing relationship or obligations with SFC in Minnesota (or elsewhere).

"A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011) (citing *Burger King Corp.*, 471 U.S. at 478–79). However, a contract is ordinarily "an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *K–V Pharm. Co.*, 648 F.3d at 593 (quoting *Burger King Corp.*, 471 U.S. at 479). "To determine whether a defendant purposefully established minimum contacts with the forum, [the district court] must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Creative Calling*, 799 F.3d at 980 (quoting *Burger King Corp.*, 471 U.S. at 479).

Here, the Parties' contracts cannot reasonably be understood to justify the exercise of personal jurisdiction over DNO. As a matter of law, they cut the other way. SFC and DNO inked two contracts, the first entitled "General Supply Agreement" and the second a "Mutual Confidentiality and Non-Disclosure Agreement." First DiNovo Decl., Exs. 3, 4 [ECF No. 6-1 at 7–16]. The General Supply Agreement describes the Parties' obligations—most falling on DNO—*if* SFC were to order products from DNO. But at least insofar as this contract is concerned, that's a big if. The contract does not obligate SFC to order anything at any time from DNO. In other words, the General Supply Agreement anticipates the possibility of future transactions, but alone establishes no continuing

relationship or obligation that SFC and DNO actually do business together.[5]   The Mutual

Confidentiality and Non-Disclosure Agreement is similar.   It neither requires nor

anticipates any particular transaction and in its first paragraph explains that the contract's

purpose is to enable SFC and DNO to evaluate "*potential* business opportunities[.]"   *Id.*,

Ex. 4 at 15 (emphasis added).   SFC fairly points out that both the General Supply

Agreement and the Mutual Confidentiality and Non-Disclosure Agreement contain

Minnesota choice-of-law terms.   *Id.*, Ex. 3 at 13, Ex. 4 at 16.   But the binding rules are that

"choice-of-law provisions specifying that the forum state's law govern are insufficient on

their own to confer personal jurisdiction," *K-V Pharm. Co.*, 648 F.3d at 594, and though

relevant, *id.*, a choice-of-law provision does not warrant the exercise of personal

jurisdiction in the forum that is the source of chosen law when the contract containing the

provision "did not require performance or contemplate future consequences specifically"

in that forum, *Fastpath, Inc.*, 760 F.3d at 822.   That is what we have here.

Apart from the contracts, other evidence confirms the absence of a committed

relationship or ongoing obligations between SFC and DNO.   In a declaration, SFC Senior

Buyer Donna Wendorff testifies: "Due to the amount of work involved for both DNO and

SFC, we would not have proceeded with our qualification process [resulting in the General

Supply and Mutual Confidentiality and Non-Disclosure Agreements] if we did not

---

[5]      One term highlights this understanding.  The General Supply Agreement includes a
"WHEREAS" clause saying that "Supplier [DNO] desires to supply Buyer [SFC] with
certain ingredients, materials, packaging or finished goods (collectively the "Products"), in
accordance with the terms and conditions set forth in this Agreement."  First DiNovo Decl.,
Ex. 3 at 8.  There is no counterpart clause suggesting that SFC "desires" or commits to
buying products from DNO.

anticipate an ongoing business relationship with DNO." Wendorff Decl. ¶ 16 [ECF No. 11]. Elsewhere, however, Wendorff is clear that SFC's relationship with DNO involved no ongoing obligations beyond the at-issue cabbage delivery. For example, she describes SFC's interest in DNO "as a potential holistic supplier," *id.* ¶ 15, and how the "initial purchase order with DNO . . . provided DNO a good opportunity to demonstrate its capabilities to SFC and the ability to supply SFC in additional areas if it performed well," *id.* ¶ 25; *see id.* ¶ 6 (describing how SFC "envisioned opportunities for DNO to support SFC's broader production efforts[]"); ¶ 7 (describing negotiations with DNO concerning "a potential supplier relationship" beginning "around March 2019"). Consistent with this testimony, though the Parties executed the General Supply and Mutual Confidentiality and Non-Disclosure Agreements in late October and early November 2019, First DiNovo Decl., Ex. 3 at 13, Ex. 4 at 16, SFC did not order product from DNO until October 20, 2020, roughly one year later, *id.* ¶ 15, Ex. 6. And the cabbage DNO supplied in response to this order prompted this suit. As far as may be gleaned from the record, this was the *only* order DNO filled for SFC. *See id.* ¶ 15 (describing the transaction as "a one-time order for fresh cabbage"); Wendorff Decl. ¶ 12 (describing the transaction as "a good first step for the business relationship[]"); ¶ 25 (describing the transaction as "a good opportunity [for DNO] to demonstrate its capabilities to SFC").

Viewed against the absence of any ongoing business relationship or obligations between SFC and DNO, DNO's other Minnesota contacts are not of a nature or quality to raise questions about whether this factor weighs against finding personal jurisdiction. Here, SFC relies primarily on a February 10, 2020 meeting in Marshall, Minnesota

attended by two DNO representatives—DiNovo and DNO's Vice President of Sales and Marketing, Jeremy Taylor, Wendorff Decl. ¶¶ 9–15, and a process it followed to approve DNO as a potential supplier, *id.* ¶¶ 16–23.

The sales meeting deserves little weight. The meeting's purpose was to give DiNovo and Taylor a chance to make "a sales presentation on how [DNO] could holistically support SFC." *Id.* ¶ 9. The meeting included a PowerPoint presentation. First DiNovo Decl. ¶ 14, Ex. 5. Based on DiNovo and Taylor's presentation, Wendorff "understood and believed that DNO was soliciting SFC for its business." Wendorff Decl. ¶ 14. The meeting took roughly one hour. First DiNovo Decl. ¶ 13. The occurrence of an in-forum sales pitch is no doubt relevant to determining whether there is personal jurisdiction in some cases. *See Whaley v. Esebag*, 946 F.3d 447, 452 (8th Cir. 2020). But here, the better answer is that DNO's sales pitch does not favor finding personal jurisdiction. It occurred after execution of the General Supply Agreement and the Mutual Confidentiality and Non-Disclosure Agreement. If it shows anything, then, the sales pitch confirms the understanding that those contracts established no ongoing business relationship. In other words, notwithstanding the presence of these agreements, DNO still had to ask for SFC's business. In fact, SFC did not place its first (and only) order with DNO until over eight months after the meeting. Most importantly, the sales pitch was largely unsuccessful where it matters most in the personal jurisdiction analysis: notwithstanding DNO's hope of a long-term relationship, the meeting neither resulted in nor shows the existence of ongoing obligations tying DNO to Minnesota.

The process SFC followed to approve DNO as a potential supplier deserves little weight, also. Wendorff Decl. ¶¶ 16–23. Apart from communications between SFC and DNO and a decision "to move forward for line testing," *id.* ¶ 19, this process occurred outside of Minnesota—between DNO in Ohio and one of SFC's Houston plants. "DNO submitted sample cabbage heads to the plant in Houston . . . for initial inspection." *Id.* This inspection included "line testing" with "an initial run to evaluate the product's impact on [SFC's] equipment and conformity to SFC's final product." *Id.* Though SFC describes how its "final decision of whether to move forward for line testing" occurred in Minnesota, SFC's description of the decision-making process is nonspecific and omits mention of any Minnesota contacts DNO may have had as part of the process. And the approval process—like the Parties' contracts and other course-of-dealing evidence—does not possess attributes showing that, through it, DNO purposefully established a substantial connection with Minnesota.[6]

---

[6]     In assessing the quality of DNO's Minnesota contacts, another "crucial factor in determining whether the defendant availed itself of jurisdiction is the nonresident defendant's effort to initiate or induce the transaction." *Viracon, Inc. v. J & L Curtain Wall LLC*, 929 F.Supp.2d 878, 884 (D. Minn. 2013) (citation omitted). Courts ask whether the defendant was the "aggressor" to the transaction. *Datalink Corp. v. Perkins Eastman Architects, P.C.*, 33 F. Supp. 3d 1068, 1073 (D. Minn. 2014). There is not a clear answer to that question here. No doubt DNO pitched its business to SFC. At the same time, Wendorff seems to testify that the idea of a business relationship between SFC and DNO originated with SFC. Specifically, she testifies that DNO had supplied ingredients to CJ Foods, an affiliate of a company that purchased SFC, and that after this company's acquisition of SFC, she was asked by SFC's Director of Purchasing Ingredients "to begin the process of 'qualifying' DNO as a cabbage supplier for [SFC's] plant in Houston, Texas . . ., which had the most urgent need for additional cabbage suppliers at that specific time." Wendorff Decl. ¶¶ 5–6. Wendorff pegs the date of this request to qualify SFC at "[o]n or about March 15, 2019," *id.* ¶ 6, well before DNO engaged in the Minnesota contacts SFC relies on to oppose DNO's motion. On this record, this factor does not favor SFC.

In arguing that the nature and quality of DNO's Minnesota contacts support the exercise of personal jurisdiction, SFC argues that this case is like another case from this district in which the court determined it had personal jurisdiction over a non-resident corporation: *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 108 F. Supp. 2d 1057 (D. Minn. 2000). It is not. There, St. Paul Fire and Marine Insurance Company, a Minnesota company, contracted with Courtney Enterprises, a Texas corporation, through a series of agreements to provide claims-handling services pertaining to general liability, workers' compensation, and employers' liability insurance. *Id.* at 1058–59. The contracts spanned at least four years and imposed significant ongoing obligations on both parties. *Id.* at 1059. As part of the agreements, for example, Courtney was required "to advance St. Paul substantial sums which St. Paul in turn would use to pay Courtney's claims." *Id.* The business relationship created by the St. Paul-Courtney contracts was extensive, definite, and ongoing, qualities missing from the SFC-DNO relationship. Some of the St. Paul-Courtney contracts also included, in addition to a Minnesota choice-of-law clause, a provision "specifying Minnesota as the arbitral forum in the event of a dispute between the parties[.]" *Id.* The court described the presence of this Minnesota forum-selection clause as "[m]ost important[]" to its determination that it possessed personal jurisdiction over Courtney. *Id.* There is no forum-selection clause here. On the whole, then, *St. Paul Fire and Marine Insurance Co.* seems quite different from this case.

By contrast, this case looks a lot like cases where a non-forum defendant contracted with an in-forum plaintiff to undertake obligations in locations other than the forum state. It would be a mistake to think that there is a per se rule forbidding, or a presumption against,

the exercise of personal jurisdiction in such cases. Regardless, by its terms, that kind of relationship often lacks the qualities necessary to show that a non-forum defendant possessed a substantial connection with the forum state that, in turn, warrants personal jurisdiction. *See, e.g.*, *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 474, 478–79 (8th Cir. 2012); *Fredin Brothers, Inc. v. Anderson*, No. 19-cv-1679 (NEB/HB), 2019 WL 7037674, at *3 (D. Minn. Dec. 20, 2019).

(2) In view of their nature and quality, the quantity of DNO's Minnesota contacts cannot justify a finding of personal jurisdiction. With respect to this factor, SFC points out that the Parties had many communications. The number is not certain, but SFC says its "dozens," Pl.'s Mem. in Opp'n at 15, and DNO doesn't dispute that estimate. The communications SFC identifies concerned the Parties' relationship, the two contracts, DNO's Marshall, Minnesota sales presentation, DNO's ongoing "solicitation efforts," the at-issue cabbage order, and subsequent communications concerning DNO's alleged breach. *Id.* If the nature and quality of these contacts aren't sufficient to establish personal jurisdiction over DNO in Minnesota, then it would seem at least highly questionable to conclude that the sheer number of contacts is. No case is cited, for example, exercising personal jurisdiction over a party whose contacts are numerous enough to overcome their qualitative insufficiency.

(3) The third factor—the relationship of SFC's cause of action to DNO's Minnesota contacts—tilts against finding personal jurisdiction, though not entirely. There is no dispute that the at-issue cabbage transaction originated in Minnesota. From Minnesota, Wendorff "contacted DNO to see if it could supply [SFC's] cabbage shortage." Wendorff

12

Decl. ¶ 24. "All negotiations with DNO leading up to the purchase order from [SFC's] side occurred in Minnesota." *Id.* But that appears to have been it. The actual purchase order was sent to DNO by Crystal Hernandez, Material Planner with SFC in Houston. *Id.* ¶ 26; *see* First DiNovo Decl. ¶¶ 15–16, Ex. 6. From there, DNO ordered cabbage from one of its suppliers, Butch's Best, LLC, based in Michigan. First DiNovo Decl. ¶¶ 17–18. "To fulfill DNO's order, Butch's Best placed an order . . . with Iott Ranch & Orchard, Inc.[,]" also based in Michigan. *Id.* ¶¶ 19–21. A third-party carrier, MegaCorp Logistics, LLC, transported the cabbage from Michigan to SFC's Houston plant from October 22 to October 24, 2020. *Id.* ¶ 22. No record evidence shows that any of these non-parties had Minnesota connections. From there, all material events—the processing of the cabbage and the damage allegedly done to SFC and its equipment—occurred entirely in Houston. The bottom line is that, while some of DNO's Minnesota contacts relate to SFC's claims, the great bulk of DNO's suit-creating activities occurred elsewhere, primarily in Ohio, Michigan, and Texas. Insofar as this purchase order is concerned, DNO did not agree to perform any act in Minnesota. *See HEK LLC v. Akstrom Imports, Inc.*, No. 20-cv-1881 (NEB/LIB), 2021 WL 679585, *2–3 (D. Minn. Feb. 22, 2021); *Patrick's Rest., LLC v. Singh*, No. 18-cv-764 (ECT/KMM), 2019 WL 2869082, at *6 (D. Minn. July 3, 2019). This factor does not create a genuine dispute about the absence of personal jurisdiction over DNO in Minnesota.

(4) and (5) As noted earlier, "the better understanding of the Eighth Circuit's statements that the last two factors are 'not determinative' or 'not dispositive' is that those factors cannot establish jurisdiction when there are not otherwise minimum contacts with

the forum." *Blue Cross & Blue Shield of N.C.*, 2021 WL 465323, at *5 n.3. If they could affect the outcome, the last two factors do not favor personal jurisdiction so strongly as to overcome the absence of a substantial connection between DNO and Minnesota. Measuring Minnesota's interest in providing a forum for SFC seems like an inexact science. Obviously, SFC is a Minnesota-based business, Wendorff Decl. ¶¶ 2–3, and Minnesota has an interest in providing a litigation forum for SFC. *See K-V Pharm. Co.*, 648 F.3d at 595. There are reasons to think that interest may not be so strong when, as here, most of the litigation-provoking activities and resulting damages occurred in another state. Regardless, whatever its precise extent here, Minnesota's interest "cannot make up for the absence of minimum contacts." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996). Again, if it could affect the outcome, the convenience to the Parties of a Minnesota forum does not justify concluding there is personal jurisdiction over DNO. No doubt Minnesota is a convenient forum for SFC, but it's not obvious that Minnesota is convenient for SFC in every respect. The bulk of SFC's damages occurred in Houston. That is where its equipment was damaged, shut down, and required inspection, cleaning, and repairs. It seems reasonable to think that discovery must occur there, and important trial witnesses and exhibits will come from there. Minnesota is not a convenient forum for DNO.

"When a federal district court determines it lacks personal jurisdiction over defendants and the 'plaintiff seriously intends to press [its] claim,' the result should be an order transferring the case to an appropriate judicial district rather than outright dismissal." *Ready 4 A Change, LLC v. Sourcis, Inc.*, No. 18-cv-1341 (ECT/ECW), 2019 WL 252028,

at *5 (D. Minn. Jan. 17, 2019) (quoting *Thompson v. Ecological Sci. Corp.*, 421 F.2d 467, 470 n.4 (8th Cir. 1970)).  The problem is that SFC and DNO disagree about where the case should be transferred, and the issue has not been the subject of sufficient briefing.  DNO has identified a federal court in "either Michigan or Ohio[,]" Def.'s Mem. in Supp. at 10 [ECF No. 5], without specifying a particular district, and it has not adequately explained why a district in either state would be preferable to the Southern District of Texas (in which Houston is located).  SFC suggested at the hearing on DNO's motion that Texas is second to Minnesota as its preferred forum, but SFC has not requested transfer as an alternative to outright dismissal.  For these reasons—the Parties' disagreement, the absence of thorough briefing on the subject, and the fact that SFC has not requested transfer—the case will be dismissed outright, leaving SFC the opportunity to appeal or proceed to file elsewhere.

**ORDER**

Based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 3] is **GRANTED**.

2. This action is **DISMISSED** without prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  July 27, 2021                                    s/ Eric C. Tostrud
                                                         Eric C. Tostrud
                                                         United States District Court